

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-23-00320-CV

---

IN THE INTEREST OF M.A.H., A CHILD

---

On Appeal from the County Court at Law No. 2
Randall County, Texas
Trial Court No. 81875L2, Honorable Matthew C. Martindale, Presiding

---

January 31, 2024

## MEMORANDUM OPINION

Before PARKER and DOSS and YARBROUGH, JJ.

In this accelerated appeal, appellant, Father, seeks reversal of the trial court's judgment terminating his parental rights to M.A.H.[1] By his appeal, Father asserts his due process rights were violated when the trial and de novo hearing proceeded without him, the evidence is insufficient to support the predicate grounds and best interest findings, and he received ineffective assistance of counsel. We modify the judgment and affirm as modified.

---

[1] To protect the privacy of the parties involved, we refer to the child by initials and to the parents of the child as "Mother" and "Father." *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b).

**BACKGROUND**

The child the subject of this case is nine-year-old M.A.H. He lived primarily with Mother until her death on August 24, 2019. M.A.H. lived with Father for an undetermined period of time after Mother's death. When Father learned he would be incarcerated because of drug-related crimes, he placed M.A.H. with Samuel Smith and gave Smith the ability to consent to medical treatment.

The Department became involved with M.A.H. in August of 2022, when Smith brought M.A.H. to the Department's office because he was unable to care for him any longer. According to Smith, M.A.H. was a troubled child who had made many unsubstantiated allegations of physical abuse against Smith. The latest allegation was made after M.A.H. was reported as a runaway. M.A.H. told law enforcement that Smith physically abused him. The Department opened an investigation and ruled out the allegations of abuse against Smith.

M.A.H. told the Department investigator that he was disciplined by Father and "he barely spent any time with [Father], because [Father] was always working to make money to buy drugs." Father, who was serving a six-year sentence in the penitentiary for possession of a controlled substance and tampering with evidence, was interviewed by the investigator. Father gave the Department names for possible caregivers for M.A.H. but they were unsuitable or unwilling to care for M.A.H. The Department took M.A.H. into care because there was no one else available to care for him. Father remained incarcerated for the duration of the underlying proceedings.

The Department filed its petition for protection, conservatorship, and termination of parental rights of Father. Following an adversary hearing, the Department was appointed temporary managing conservator and M.A.H. was placed in a foster home.

A Department caseworker created a service plan for Father, which required him to complete specified tasks and services before reunification with M.A.H. could occur. As a part of the plan, Father was not permitted to have visits with M.A.H. until he had a clean drug screen. Father admitted to the caseworker that "he had messed up several times, and let drugs take over" and that "he was sorry for that [for M.A.H.]" Father was provided workbooks for parenting and substance abuse, but he did not complete either workbook. The plan described M.A.H. as a healthy nine-year-old boy with no physical limitations, developmental delays, or emotional or behavioral health issues.

At trial, the caseworker testified that she attempted to contact M.A.H.'s older siblings for placement, but she did not receive a response. The maternal grandfather, a registered sex offender, was not suitable for placement, and the maternal grandmother could not be located. The extent of Father's contact with M.A.H. during the pendency of this case was two letters that Father wrote to him.

The Department presented evidence that Father was arrested in the early morning hours of September 2, 2020, in Cooke County, Texas on felony charges of possession of a controlled substance (methamphetamine) and tampering with evidence. Father remained in jail for 149 days while he was awaiting his court date. In January of 2021, he pleaded guilty to the charges and was placed on community supervision. While on supervision, Father admitted to using methamphetamine and failed to abide by the terms

3

and conditions of his supervision. In July of 2022, Father's community supervision was revoked, and he was sentenced to six years in the Texas Department of Criminal Justice (TDCJ), with a jail time credit of 241 days. Father was incarcerated and serving his sentence when the termination trial commenced in August of 2023. His projected release date is June 14, 2024, and his maximum sentence date is November 20, 2027.

The Department presented evidence that law enforcement conducted a welfare check on M.A.H. in February of 2014. According to a Randall County deputy sheriff, he knocked on the door where Mother, Father, and M.A.H. were living, but no one would answer the door. After the deputy left, he determined that Mother and Father had outstanding warrants, so he obtained a search warrant and returned to the home with four additional officers. After knocking on the door with no answer for twenty minutes, officers forcefully entered the home. Officers found marijuana paraphernalia in the home and Father was arrested on a warrant for possession of marijuana. According to the deputy, it was "an inherently dangerous situation" to force entry into a home under these circumstances.

The Department also presented evidence that Father was convicted of a class "B" misdemeanor for possession of marijuana on February 26, 2014, and a class "B" misdemeanor for theft on November 25, 2014.

By the time of trial, M.A.H. was ten years old. He was placed with a foster family in Lubbock after his removal. He is receiving counseling and is doing very well. M.A.H. "loves" the placement and wants to stay there until he turns eighteen. The placement is interested in providing long-term placement for M.A.H.

4

The associate judge held a final hearing via Zoom videoconferencing. Father did not appear, but he was represented by an attorney. After testimony, the associate judge terminated Father's parental rights on the grounds of abandonment and failure to comply with a court order that established actions necessary to retain custody of M.A.H. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N), (O).[2] The court also found that termination would be in M.A.H.'s best interest. *See* § 161.001(b)(2). The court appointed the Department as the managing conservator of M.A.H.

The Department timely filed a request for a de novo hearing before the referring court. The court considered the record from the final hearing and additional testimony. The court terminated Father's parental rights on grounds of endangering conditions, engaging in criminal conduct resulting in his conviction, imprisonment, and inability to care for M.A.H. for at least two years from the original petition's file date, and abandonment. *See* § 161.001(b)(1)(D), (N), (Q). The trial court also found that termination was in the best interest of M.A.H. and appointed the Department as the managing conservator of M.A.H. *See* § 161.001(b)(2).

## STANDARD OF REVIEW

When reviewing the legal sufficiency of the evidence in a termination case, the appellate court should look at all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002). To

---

[2] Further references to provisions of the Texas Family Code will be by reference to "section __" or "§ __.

give appropriate deference to the factfinder's conclusions, we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been not credible, but we do not disregard undisputed facts. *Id.* Even evidence that does more than raise surmise or suspicion is not sufficient unless that evidence can produce a firm belief or conviction that the allegation is true. *In re K.M.L.,* 443 S.W.3d 101, 113 (Tex. 2014). If, after conducting a legal sufficiency review, we determine that no reasonable factfinder could have formed a firm belief or conviction that the matter that must be proven was true, then the evidence is legally insufficient and we must reverse. *Id.* (citing *In re J.F.C.,* 96 S.W.3d at 266).

In a factual sufficiency review, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.,* 96 S.W.3d at 266. We must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *Id.* We must also consider whether disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id.* If, considering the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

## APPLICABLE LAW

A parent's right to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky*

*v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *see In re M.S.,* 115 S.W.3d 534, 547 (Tex. 2003). Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985). However, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.,* 113 S.W.3d 355, 361 (Tex. 2003) (citing *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)). Recognizing that a parent may forfeit his or her parental rights by his or her acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *See id.*

In a case to terminate parental rights under section 161.001 of the Family Code, the petitioner must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination, and (2) termination is in the best interest of the child. § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." § 101.007; *In re J.F.C.,* 96 S.W.3d at 264. Both elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re K.C.B.,* 280 S.W.3d 888, 894 (Tex. App.—Amarillo 2009, pet. denied). "Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.,* 113 S.W.3d at 362. We will affirm the termination order if the evidence is both legally and factually sufficient to support any alleged statutory ground the trial court relied

7

upon in terminating the parental rights if the evidence also establishes that termination is in the child's best interest. *In re K.C.B.*, 280 S.W.3d at 894–95.

The clear and convincing evidence standard does not mean the evidence must negate all reasonable doubt or that the evidence must be uncontroverted. *In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ). The reviewing court must recall that the trier of fact has the authority to weigh the evidence, draw reasonable inferences therefrom, and choose between conflicting inferences. *Id.* The factfinder also enjoys the right to resolve credibility issues and conflicts within the evidence and may freely choose to believe all, part, or none of the testimony espoused by any witness. *Id.* Where conflicting evidence is present, the factfinder's determination on such matters is generally regarded as conclusive. *In re B.R.*, 950 S.W.2d 113, 121 (Tex. App.—El Paso 1997, no writ).

The appellate court cannot weigh witness credibility issues that depend on demeanor and appearance as the witnesses are not present. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005) (per curiam). Even when credibility issues are reflected in the written transcript, the appellate court must defer to the factfinder's determinations, if those determinations are not themselves unreasonable. *Id.*

### CONSTITUTIONAL COMPLAINT

In his first issue, Father contends that the trial court violated his "constitutional and fundamental rights to due process" as he was not allowed to appear at the final trial or the de novo hearing.

To preserve a constitutional claim for appellate review, a party must raise the issue in the trial court. TEX. R. APP. P. 33.1; *In re L.M.I.,* 119 S.W.3d 707, 711 (Tex. 2003) (holding that, to preserve argument for appellate review, including constitutional arguments, party must present it to trial court by timely request, motion, or objection, state specific grounds therefor, and obtain ruling). We may not consider a complaint that was not ruled on by the trial court.

The record shows the trial was originally scheduled to be heard on July 31, 2023. On June 29, 2023, the associate judge entered an order to participate in the final hearing, which contained the date and time of trial, information to access the Zoom hearing, and an order for Father to be present and participate for the hearing. On July 31, trial was reset to August 14, and another order for Father's participation was signed. When the associate judge called the case for trial, Father was not present. Father's counsel announced that he was provided "the same notice as all of us," and that the notice was sent to the prison where Father was incarcerated. The case proceeded to trial. The Department's request for a de novo hearing was scheduled for September 11, and an order for Father to participate in the hearing with detailed information about the date, time, and information to access the Zoom hearing was included in the order. The order also directed that Father be present and participate for the entire hearing. After the trial court called the case for hearing, Father's counsel announced "ready" and told the judge that the order was provided to the prison, "and they did not make him available at the last hearing, so I'm guessing that they have not made him available at this time." The judge proceeded to trial without Father since "he is represented by counsel." At no time in the proceedings below did Father's counsel object to proceeding to trial without Father on

9

constitutional or any other grounds.  Accordingly, Father has failed to preserve his alleged constitutional violations for appellate review.  *See In re A.G.,* No. 07-17-00298-CV; 2018 Tex. App. LEXIS 243, at *5 (Tex. App.—Amarillo Jan. 9, 2018, pet. denied) (mem. op.).  We overrule Father's first issue.

SUFFICIENCY OF THE EVIDENCE

Section 161.001(b)(1)(D)

A parent's rights may be terminated if there is clear and convincing evidence that a parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.  § 161.001(b)(1)(D).  Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health.  *Doyle v. Tex. Dep't of Protective and Regul. Servs.,* 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied).  In this context, the child's environment refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home.  *In re S.R.,* 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).  The emphasis is on the child's living environment as it existed prior to the child's removal by the Department.  As such, the relevant timeframe for such endangerment is prior to the child's removal.  *In re C.R.,* Nos. 07-20-00314-CV, 07-20-00316-CV, 2021 Tex. App. LEXIS 1286, at *6 (Tex. App.—Amarillo Feb. 23, 2021, pet. denied) (mem. op.).  It is not necessary that the child's living environment directly threaten the child or that the child be injured, but the parent must at least be aware of the potential for danger to the child in such an environment and

10

must have disregarded that risk. *In re S.M.L.,* 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

In his second issue, Father contends there was insufficient evidence to show he knowingly placed M.A.H. in conditions that endangered his physical or emotional well-being because he placed M.A.H. in a safe environment with Smith, and "he executed documents so that Smith could get medical care for [M.A.H.] and enroll him in school."

The referral to the Department in this case originated in August of 2022, at which time Father was incarcerated and serving a six-year sentence for possession of a controlled substance and tampering with evidence. The trial court's order of emergency removal was dated August 22, 2022. Consequently, the relevant timeframe under subsection (D) is that period prior to August 22, 2022. *See In re L.E.S.,* 471 S.W.3d 915, 926 (Tex. App.—Texarkana 2015, no pet.) ("In evaluating termination under ground (D), however, we are to examine the time prior to [the child's] removal to determine whether the environment of the home posed a danger to her physical or emotional well-being.").

The evidence reflects that M.A.H. resided with Mother until her death on August 24, 2019. Although the record is unclear, at some point, after Mother's death, M.A.H. went to live with Father. The record does not establish where M.A.H. was living when Father was arrested for drug-related crimes in September of 2020 or when Father admitted to using methamphetamine in May of 2021. The record was undeveloped concerning any home environment provided by Father, evidence of the suitability of M.A.H.'s living conditions, or of the conduct of Father in the home. Other than a statement attributed to M.A.H. that "he barely spent any time with [Father], because [Father] was

11

always working to make money to buy drugs[,]" there was no evidence that Father used drugs around M.A.H., allowed him to be around the presence of drugs or drug users, or that Father had ever physically harmed him.[3]  Because of his incarceration, Father arranged for M.A.H. to live with Smith and designated Smith to consent to medical treatment, although the record is not clear when this occurred.  There was no testimony to suggest that Smith was not a responsible adult or appropriate caregiver, and no evidence that Smith's residence was a dangerous environment for M.A.H.  There was no indication at the time that M.A.H. was taken into care by the Department that he had been abused or neglected or that Father was aware that Smith was unable to further care for M.A.H.  On this record, we cannot conclude that a factfinder could form a firm belief or conviction that Father knowingly placed or knowingly allowed M.A.H. to remain in conditions or surroundings that endangered his physical or emotional well-being.[4]  As such, we sustain Father's second issue.

---

[3] The Department points to Father's history of incarceration and an "inherently dangerous situation" in February of 2014 to support a finding under subsection (D).  The incident in 2014 involved a welfare check on one-year-old M.A.H., when law enforcement forced entry into Mother's and Father's home.  Drug paraphernalia was found in the home and Father was arrested on an outstanding warrant for possession of marijuana.  A few weeks later, Father pleaded guilty to a misdemeanor charge of possession of marijuana and served twelve days in jail.  Later, in November of 2014, Father pleaded guilty to misdemeanor theft and was sentenced to fifteen days' confinement in jail.  While a parent's incarceration can negatively impact a child's living environment and well-being sufficient to show endangerment, this evidence is too remote in time and lacks any connection to M.A.H.'s living environment in August of 2022 to support a finding under subsection (D).

[4] Our resolution of this issue should not be interpreted as supporting a conclusion that no inference can ever be made that a parent's incarceration can negatively impact a child's living environment and well-being sufficient to show endangerment under subsection (D).  Here, the Department did not present evidence to allow the factfinder to infer how Father endangered the child through his incarceration.

12

Section 161.001(b)(1)(Q)

By his fourth issue, Father asserts the evidence was legally and factually insufficient to support termination of his parental rights under subsection (Q). Subsection (Q) provides a basis for termination on a finding that the parent "knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition . . . ." § 161.001(b)(1)(Q); *In re J.G.S.,* 574 S.W.3d 101, 118 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). Subsection (Q) focuses on a parent's future imprisonment and inability to care for the child. "By looking at future imprisonment and inability to care for the child, subsection Q purports to protect children whose parents will be incarcerated for periods exceeding two years after termination proceedings begin." *In re A.V.,* 113 S.W.3d at 360–61.

Here, the Department filed its petition to terminate Father's parental rights on August 18, 2022. As such, the Department was required to prove that Father would be confined or imprisoned until at least August 18, 2024. It is undisputed that, at the time the Department filed its petition, Father was incarcerated and serving a six-year sentence for possession of a controlled substance and tampering with evidence. The trial court admitted into evidence the judgments from Father's convictions and a printout from the Texas Department of Criminal Justice. These documents show that Father's six-year confinement began July 19, 2022, with a projected release date of June 14, 2024, and a maximum sentence date of November 20, 2027. The Department also presented evidence that his parole was denied on September 21, 2022, his next parole review was not until September 20, 2023, and it was uncertain whether he would be released then.

13

In his briefing on this issue, Father concedes that the Department produced evidence that he knowingly engaged in criminal conduct and was convicted and incarcerated. He does not address his inability to care for M.A.H. during his incarceration. Father's challenge focuses on the evidence of whether his incarceration will continue for at least two years from the date the termination petition was filed, that is, until August 18, 2024. Father points to evidence of his projected parole eligibility date of June 14, 2024, which is less than two years from the date the petition was filed.

The Texas Supreme Court has determined that parole eligibility and the projected release date are relevant, but not dispositive evidence of when an incarcerated person will in fact be released from prison. *In re H.R.M.,* 209 S.W.3d 105, 108–09 (Tex. 2006) (per curiam). The introduction of parole-related evidence, however, does not prevent a factfinder from forming a firm conviction or belief that the parent will remain incarcerated for at least two years. *Id.* at 109. Here, there is no evidence of the certainty of Father's projected release date. Moreover, the trial court had before it evidence that Father's last parole decision was denied favorable action because of his criminal history, excessive substance use involvement, and unsuccessful supervision on his previous probation. "Parole decisions are inherently speculative, and while all inmates doubtless hope for early release and can take positive steps to improve their odds, the decision rests entirely within the parole board's discretion." *Id.* (citations omitted). We conclude the evidence is legally and factually sufficient to support the finding that Father would remain incarcerated for two years from the date of the filing of the petition. *Id.* at 109–10. We overrule Father's fourth issue.

14

In light of our conclusion regarding the trial court's finding on subsection (Q), we need not address Father's third issue and the finding under subsection (N). *In re A.V.,* 113 S.W.3d at 362 ("Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

Best Interest

In his fifth issue, Father challenges the factual and legal sufficiency of the evidence to support the best interest finding made under section 161.001(b)(2). A determination of best interest necessitates a focus on the child, not the parent. *In re B.C.S.,* 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.). Appellate courts examine the entire record to decide what is in the best interest of the child. *In re E.C.R.,* 402 S.W.3d 239, 250 (Tex. 2013). There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006).

In assessing whether termination is in a child's best interest, the courts are guided by the non-exclusive list of factors in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).[5] "[T]he State need not prove all of the factors as a condition precedent to parental termination, 'particularly if the evidence were undisputed that the parental relationship endangered the safety of the child.'" *In re C.T.E.,* 95 S.W.3d 462, 466 (Tex. App.—

---

[5] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id.*

15

Houston [1st Dist.] 2002, pet. denied) (quoting *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)). Evidence that supports one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *See In re E.C.R.*, 402 S.W.3d at 249. The best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence. *In re N.R.T.,* 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). We must also bear in mind that a child's need for permanence through the establishment of a stable, permanent home has been recognized as the paramount consideration in determining best interest. *See In re K.C.,* 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.).

The evidence showed that M.A.H. lived primarily with Mother until her death in 2019. M.A.H. lived with Father for a year until Father was arrested in September of 2020 for drug-related crimes. There was evidence that M.A.H. did not have a close bond with Father. According to M.A.H., Father did not spend a lot of time with him because he was always working to buy drugs. Father admitted he had a substance abuse issue and that "he had messed up several times, and let drugs take over" and that "he was sorry for that [for M.A.H.]" Around the time that Father was incarcerated, he made arrangements for M.A.H. to live with Smith, and Smith was given the ability to consent to medical treatment and care for M.A.H. After receiving four years' community supervision in January of 2021 for possession of a controlled substance and tampering with evidence, Father tested positive for methamphetamine in May of 2021. In July of 2022, Father's probation was revoked, and he was sentenced to six years in the penitentiary. Father was incarcerated in August of 2022, when Smith left M.A.H. to be cared for by the Department. Father remained incarcerated during the entirety of the underlying proceedings. His continued

16

incarceration subjects M.A.H. to a life of uncertainty and instability. A parent's imprisonment is a factor that may be considered in determining a child's best interest. *In re M.L.,* No. 07-20-00195-CV, 2020 Tex. App. LEXIS 9483, at *16 (Tex. App.—Amarillo Dec. 4, 2020, no pet.) (mem. op.). A trial court is permitted to consider a parent's drug use and inability to provide a stable home in its best interest determination. *In re S.B.,* 207 S.W.3d 877, 887−88 (Tex. App.—Fort Worth 2006, no pet.).

Other evidence supports the trial court's finding that termination of Father's parental rights was in M.A.H.'s best interest. At the time of trial, M.A.H. was ten years old, and he had remained with the same placement since August of 2022. M.A.H. expressed to the caseworker that he "loves" his current placement. According to the caseworker, he is doing well and would like to stay in the placement until he turns eighteen. The foster family is willing to have a long-term placement with M.A.H. The only contact Father had with M.A.H. after his incarceration was sending two letters to M.A.H. According to M.A.H., he does not know Father well, but he still loves him. Because of Father's continued incarceration, it is likely that his limited interaction with M.A.H. would continue for the foreseeable future. *See In re N.R.T.,* 338 S.W.3d at 677 (considering that appellants had "no meaningful contact" with their child as evidence relevant to best interest determination).

Stability and permanence are paramount in the upbringing of a child. *In re J.D.,* 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The factfinder may compare the parent's and the Department's plans for the child and determine whether the plans and expectations of each party are realistic or weak and ill-defined. *Id.* at 119−20. Although Father did not complete any services set out in his plan of service, he maintained

contact throughout the case with the caseworker. He desired to have a father-son relationship with M.A.H. when he is released from prison. In contrast, the Department's plan for M.A.H. is a long-term placement with his current foster family. The Department's plan would provide permanence and stability for M.A.H.

We conclude the evidence is legally and factually sufficient to establish a firm conviction in the mind of the trial court that termination of Father's parental rights is in the best interest of M.A.H. We overrule issue five.

## INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

In his last issue, Father asserts his counsel was ineffective for failing to request a continuance once it became clear that he was not made available telephonically to attend the trial and de novo hearing.

In Texas, there is a statutory right to counsel for indigent persons in parental-rights termination cases and this right encompasses the right to effective counsel. § 107.013(a)(1); *In re M.S.,* 115 S.W.3d at 544. The standard of review to apply in evaluating claims of ineffective assistance of counsel in termination of parental rights cases is the same as that set forth by the United States Supreme Court for criminal cases in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "Under the well-established *Strickland* test, proving ineffective assistance of counsel requires a showing that (1) counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense, which 'requires showing that counsel's errors were

18

so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *In re H.R.M.,* 209 S.W.3d at 111 (quoting *In re M.S.,* 115 S.W.3d at 545).

To determine whether representation was deficient, we must consider all of the circumstances surrounding the case and determine whether counsel was "reasonably effective." *In re M.S.,* 115 S.W.3d at 545. In doing so, we afford great deference to counsel's performance, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.*

In conducting the harm analysis under the second prong of *Strickland*, reviewing courts must determine whether there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. *In re M.S.,* 115 S.W.3d at 549–50.

An allegation of ineffective assistance of counsel in a termination proceeding must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness and the resulting harm. *Walker v. Tex. Dep't of Family & Protective Servs.,* 312 S.W.3d 608, 622–23 (Tex. App.—Houston [1st Dist.] 2013, pet. dism'd).

In considering the record from the final hearing before the associate judge and the record from the de novo hearing before the referring court, the record does not support Father's contention that his trial counsel was ineffective. As we have detailed in the analysis of Father's first issue, the record contains an order requiring Father's participation in each respective hearing. At the final hearing, Father's counsel represented to the court that "we sent the prison notice for [Father] to appear." Likewise, at the de novo hearing, Father's counsel told the court that the order to participate was

19

sent to TDCJ and "they did not make him available at the last hearing, so I'm guessing that they have not made him available at this time, Your Honor." The record shows that Father's appointed counsel questioned witnesses and proffered argument on his behalf.

There is nothing in the record before us showing the reason that counsel did not request a continuance or that her actions were unreasonable. Without an explanation from trial counsel for her actions and in light of the strong presumption in favor of reasonable representation, the record here does not reflect that trial counsel lacked sound strategic reasons for her conduct. *See In re M.S.,* 115 S.W.3d at 549. As to the second prong of the *Strickland* test, Father has not even attempted to show how counsel's requesting a continuance would have resulted in a different outcome or how counsel's alleged deficiencies prejudiced the case, deprived him of a fair trial, or produced an unreliable result. *See In re H.R.M.,* 209 S.W.3d at 111. As such, we conclude that Father has failed to show that his trial counsel was deficient or that she prejudiced his defense. We overrule issue six.

## CONCLUSION

Having found no evidence to support termination of Father's parental rights under subsection (D), we modify the trial court's judgment to delete this subsection as a ground for termination. As so modified, we affirm the trial court's judgment.

Judy C. Parker
Justice

20